UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
BRYSON CITY DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 2:13-CR-15 |
| | ) | |
| v. | ) | |
| | ) | |
| 1) JEROME BROCK PARKER, | ) | |
| 2) JERRY FRANCIS PARKER | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS INDICTMENT**

NOW COMES the United States of America, by and through Anne M. Tompkins, United States Attorney for the Western District of North Carolina, and respectfully submits this combined opposition to the above-named defendants' motions to dismiss the indictment and their briefs in support of such motions, Document Numbers 77, 79, 80, and 81.

The indictment charges these defendants with one substantive violation of the Lacey Act, that is, that they knowingly sold, acquired, received, and transported wildlife that they knew had been taken or possessed in violation of federal law, and aided and abetted each other in the commission of such offense, in violation of 16 U.S.C. § 3372(a)(1) and 18 U.S.C. § 2; and with one count of conspiring to violate the Lacey Act, in violation of 18 U.S.C. § 371. With one exception, the defendants, under the guise of asserting that the indictment should

1

be dismissed on jurisdictional grounds, have actually filed a premature Rule 29 motion, alleging insufficiency of the evidence, and failure to prove all the elements of the crimes beyond a reasonable doubt, before the trial has even begun. The Government declines their invitation to try its case in this response, but it is the Government's position that the evidence at trial will prove all of the allegations contained in the indictment (which is relatively detailed in its factual assertions, and lays out the Government's theory of culpability), and that at the close of the presentation of the evidence the Court will be satisfied that the Government has presented a case sufficiently strong to go to the jury.

The defendants do raise a federal subject matter jurisdiction argument when they contend that the killing of the undersized bear, as alleged in Count Two and in Overt Act 3 of Count One, did not take place on property over which the United States has jurisdiction, and thus the killing could not have been in violation of federal law. The defendants assert that this killing took place on private land, rather than on federal land within the Nantahala National Forest.

The evidence will show that the killing of the bear took place on a location as indicated by a red circle on the attached annotated detail map, Exhibit 1. As that map indicates, the geographic coordinates of this location are: latitude 35 degrees, 0.772 minutes North, and longitude 83 degrees, 20.262 minutes West.

2

As Exhibit 1 indicates, this spot is well within the Nantahala National Forest, near the dividing line between two parcels of land known as Tract S-31-G-5, and Tract S-17a. Tract S-31-G-5 has been owned by the United States since 1916, following a condemnation action in this Court. *See* Exhibit 2. Tract S-17a has also been owned by the United States since 1916, also following a condemnation action in this Court. *See* Exhibit 3. As discussed below, the United States was authorized to acquire this land, and the federal government has concurrent jurisdiction over offenses committed on it.

Before turning to the legal argument, however, it may be useful to clarify a point that seems to have confused the defendants and has given rise to some level of humor, in that they allege that the geographic coordinates given to them in discovery would place the alleged offense in Libya (and their attorneys quite credibly deny any knowledge of Libyan wildlife protection laws). This confusion arises because there are several formats by which the same geographic location may be indicated. The classic format is known as "Degrees, Minutes, Seconds" (DMS), where there are three whole numbers: *e.g.*, "35 00 46," where "35" represents the degree of longitude or latitude, "00" represents the number of minutes (each degree being divided into 60 minutes), and "46" represents the number of seconds (each minute being divided into 60 seconds). Further

3

precision can be obtained by subdividing the seconds even further, into a digital (or metric) format, so that, for example, 46-and-three-tenths of a second would be noted as "46.30."

Two other methods are the "Decimal Minutes" (DM) and the "Decimal Degrees" (DD) formats. In the DM format, the location is listed as a whole number for the degree, a whole number for the minute, but there are no seconds, with the minute instead being subdivided into tenths, hundredths, thousandths, etc. In the DD format, the globe is still divided into degrees, but the degrees are not, in turn, divided into minutes and seconds. Rather, there is a decimal point to the right of the degree, and the degree is divided into tenths, hundredths, thousandths, etc.; for example, a DMS format of: 35 00 46 would be noted as 35.012778 in the DD format. *See* Exhibit 4, which lists the location of a single site in multiple formats

The annotated map, Exhibit 1, which has previously been provided in discovery to the defendants, lists the coordinates in the DM format, where there are numbers for the degrees and minutes, but no seconds. Thus, the map's listing of "35 0.772 N" means the site is at a latitude of 35 degrees and 0.772 minutes. By contrast, the coordinates of various points of interest previously given to the defense, and included as pages 9-11 of Document 80, are in the DMS format (with

4

the seconds being further subdivided into tenths and hundredths). Thus, the listing on page 11 of Doc. 80 for "Sgt. Arnold Bear Kill Site" lists a latitude of "N35 00 46.30" (meaning 35 degrees, 0 minutes, and 46.30 seconds) and a longitude of "W083 20 15.88" (meaning 83 degrees, 20 minutes, and 15.88 seconds). These are simply different ways of noting the same spot.

The defendants have provided, at page 12 of Doc. 80, a page from a website that they used to try to find a map corresponding to the coordinates, but they apparently plugged in the wrong format, resulting in their virtual trip to the Sahara. The Government has gone to the very site used by the defendants and entered the coordinates in both the DMS format (as used in the 3-page coordinates list given to the defense) and in the DM format (as used in Exhibit 1.) The results of that visit to the website are attached as Exhibit 4, and they both show the correct location for the offense, safely within the verdant Western District of North Carolina.

## ARGUMENT

### I.  The Constitutional Bases for Federal Jurisdiction

*A. Federal Ownership of the Land*

Turning now to the legal issues (following that foray into the world of geographic notation systems): as an initial matter, it is important to distinguish between the federal government's power to acquire and own land, on the one hand,

and its power to exercise legislative jurisdiction over such property, whether exclusive or concurrent, on the other. The National Forest System as it now exists was created by the Weeks Forestry Act, Act Mar. 1, 1911; 36 Stat. 961; 16 U.S.C. §§ 460 *et. seq*., which authorized the Secretary of Agriculture to acquire land for purposes of inclusion within national forests, and to administer and regulate the use of such land. Under the Supremacy Clause, U.S. Const., Art. VI, § 2, the United States ordinarily has the power to acquire title to real property, whether by purchase, gift, or condemnation, without the consent of the state in which such property is located. *See Paul v. United States*, 371 U.S. 245, 264-65 (1963). In the Weeks Act, however, Congress imposed a limitation on this power as to lands acquired for national forests, requiring that the legislature of the State in which the land lies consent to its acquisition. 16 U.S.C. § 515.

In January 1920, President Woodrow Wilson proclaimed the creation of the Nantahala National Forest in Georgia, South Carolina, and North Carolina.[1] Pres. Proc. No. 66, 41 Stat. 1785-86. The relevant outer boundaries of that forest were established in a proclamation issued by President Franklin Roosevelt on July 9, 1936. Pres. Proc. No. 2185, 50 Stat. 1742-43. In relevant part, the boundaries were defined as "easterly up and with the meanders of the left bank of the Little

---

[1] In 1891, Congress empowered the President to set apart and reserve public lands as national forests and to establish such forests and their "limits," or exterior boundaries, by "public proclamation." 30 Stat. 34, 36, codified at 16 U.S.C. § 471.

Tennessee River to the mouth of the Tuckasegee River; thence easterly with the meanders of the left bank of the Tuckasegee River to a point opposite the end of a long ridge approximately ½ mile north of Wilmot . . . ." *Id*. at 1743. As the Fourth Circuit noted in *United States v. Stephenson*, 29 F.3d 162, 164 (4th Cir. 1994), the boundary between the Nantahala National Forest and the Great Smoky Mountains National Park (GSMNP) is this left boundary of the river, but the river was flooded in the process of creating Fontana Lake, so that the boundary between the park and the forest now runs through the lake. This boundary line is indicated on Exhibit 1.

### B. *Federal Jurisdiction over the Land*

Turning to the separate issue of federal jurisdiction over such federally-owned property, the Constitution provides two independent bases for jurisdiction: the Enclave Clause, U.S. Const., Art. I, § 8, cl. 17,[2] and the Property Clause, U.S. Const., Art. IV, § 3, cl. 2. [3] In a thorough analysis of the "relationship between these two independent grants of federal property power," District Judge T.S. Ellis, III, observed that the Enclave Clause grants Congress legislative

---

[2] The Enclave Clause grants Congress the power "to exercise . . . authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings." The courts have taken a broad view of the "other needful buildings" language, holding that it authorizes purchase of, and authority over, national park and forest lands, as well as literal buildings. *See, e.g. Collins v. Yosemite Park & Curry Co.,* 304 U.S. 518, 529 (1938).

[3] "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ."

jurisdiction over all property, federal and private, within particular geographical areas or enclaves, while the Property Clause "grants the federal government sweeping authority to dispose of and manage federally-owned land and other real property." *Commonwealth of Virginia v. Reno*, 955 F.Supp. 571, 576 (E.D.Va.), *judgment vacated as moot*, 122 F.3d 1060 (4th Cir. 1997).[4]

These two provisions have "distinct purposes and functions," with the Enclave Clause granting Congress

> legislative power over federal enclaves as a prophylactic against undue state interference with the affairs of the federal government. Yet, ever sensitive to the risk of granting the federal government unchecked power, the founders limited this federal grant of power by requiring state consent to the federal acquisition of state land for enclaves.

*Id.* (footnotes omitted). The Property Clause, which is "[s]eparate and distinct from the Enclave Clause . . . permits the federal government to buy, sell, regulate, and manage all federally-owned real property, *irrespective of state consent*." *Id.* at 578 (emphasis added). Once such land is within federal ownership, the Supreme Court has repeatedly held that the Property Clause confers upon Congress power over the land that is "without limitations.'" *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976) (quoting *United States v. San Francisco*, 310 U.S. 16, 29

---

[4]  That case involved a lawsuit by the Commonwealth of Virginia seeking the closure of a prison operated by the District of Columbia on land owned by the United States in Virginia. During the pendency of the appeal, Congress passed a law closing the prison, and the case was therefore declared moot.

(1940)); *see also California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 580 (1987).

As the *Kleppe* opinion noted, the Enclave Clause permits Congress "to acquire derivative legislative power from a State," by consensual acquisition of land or by nonconsensual acquisition followed by the State's cession of such authority. 426 U.S. at 542. On the other hand, "the presence or absence of such jurisdiction has nothing to do with Congress' powers under the Property Clause. Absent consent or cession a State undoubtedly retains jurisdiction, over federal lands within its territory, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause." *Id*. at 542-43. In our case, the federal government has jurisdiction pursuant to each constitutional clause.

## II. The United States Has Obtained Concurrent Jurisdiction Pursuant to the Enclave Clause

Under the Enclave Clause, the United States only has such derivative legislative jurisdiction, whether exclusive or concurrent, as the State grants and the United States accepts. *Fort Leavenworth R.R. Co. v. Lowe*, 114 U.S. 525, 541-42. Here, that would mean that the State of North Carolina had to consent to the jurisdiction of the United States over the parcels of land where the offenses took place. The courts have held that with regard to lands acquired prior to 1940, the

9

United States has accepted jurisdiction over national forest lands through the enactment of 16 U.S.C. § 551, which authorizes the Secretary of Agriculture to make all necessary provisions, rules, and regulations, including criminal rules and regulations, to protect the lands and their purpose. *See id.* at 528*; United States v. Raffield*, 82 F.3d 611, 612 (4th Cir. 1996). As to lands acquired since February 1, 1940, federal law provides that a state's cession of legislative jurisdiction does not take effect until formally accepted by the head, or other authorized official, of the federal department that has custody over the land. *See* 40 U.S.C. § 3112 (formerly codified as 40 U.S.C. § 255). Here, the Secretary of Agriculture complied with Section 3112 by sending a letter to Governor Michael Easley, dated December 30, 2008, accepting concurrent jurisdiction over all land acquired in North Carolina for National Forest purposes. *See* Exhibit 5.

A. *In NCGS § 104-5, North Carolina Ceded Concurrent Jurisdiction over National Forest Lands to the United States*

Since 1901, the State of North Carolina has ceded concurrent jurisdiction over national forest lands to the United States. *See* NCGS § 104-5.[5]

---

[5]   NCGS § 104-5, which has been in its current form since 1929, provides:

The United States is authorized to acquire by purchase, or by condemnation with adequate compensation, except as hereinafter provided, such lands in North Carolina as in the opinion of the federal government may be needed for the establishment of a national forest reserve in that region. This consent is given upon the condition that the State of North Carolina shall retain a concurrent jurisdiction with the United States over such lands so far

10

That statute authorizes the United States "to acquire by purchase, or by condemnation with adequate compensation, *except as hereinafter provided*, such lands in North Carolina as in the opinion of the federal government may be needed for the establishment of a national forest reserve in that region." (Emphasis added.) The only "exception" anywhere in the statute is the 200-acre carve-out language that will be found several sentences later.

The only portion of the statute addressing jurisdiction as opposed to ownership is the second sentence. That sentence concurrent legislative jurisdiction to the United States with respect to the lands it acquires for national forest purposes, and without exceptions or carve-outs.

The third sentence, the only one to contain an exception or limitation, returns to the subject of the State's giving the federal government authorization *to acquire ownership* of such lands: "Power is hereby conferred upon the Congress of the

_____

that civil process in all cases, and such criminal process as may issue under the authority of the State of North Carolina against any person charged with the commission of any crime without or within such jurisdiction, may be executed thereon in like manner as if this consent had not been given. Power is hereby conferred upon the Congress of the United States to pass such laws as it may deem necessary to the acquisition as hereinbefore provided, for incorporation in such national forest reserve such forest-covered lands lying in North Carolina as in the opinion of the federal government may be needed for this purpose, but as much as 200 acres of any tract of land occupied as a home by bona fide residents in this State on the eighteenth day of January, 1901, shall be exempt from the provisions of this section. Power is hereby conferred upon the Congress to pass such laws and to make or provide for the making of such rules and regulations, of both civil and criminal nature, and to provide punishment therefor, as in its judgment may be necessary for the management, control, and protection of such lands as may be from time to time acquired by the United States under the provisions of this section.

United States to pass such laws as it may deem necessary to the acquisition . . . [of] such forest-covered lands lying in North Carolina as in the opinion of the federal government may be needed for this purpose, but as much as 200 acres of any tract of land occupied as a home by bona fide residents in this State on the eighteenth day of January, 1901, shall be exempt from the provisions of this section."

Finally, the fourth sentence grants the United States broad authority to enact such laws and regulations as it may deem necessary for such lands as it acquires. This sentence, as well, contains no exceptions or carve-outs.

A careful reading of the statute shows, then, that the State is granting the United States authority to acquire land in North Carolina for Forest Service use, either by purchase or by eminent domain powers, and is also granting the United States concurrent legislative jurisdiction over the land it acquires; but the State (apparently concerned that the United States might misuse its condemnation powers to acquire small homesteads) prohibited the federal government from condemning any such homestead up to 200 acres in size. The second sentence of the statute, the only sentence dealing with the cession of concurrent jurisdiction, contains no exceptions or withholding of consent whatsoever.

A review of the history of this statute, as well as similar statutes enacted the same year in adjoining states, also demonstrates that North Carolina's 200-acre

12

exception relates to federal condemnation powers, not to its consent to concurrent federal jurisdiction.

1. The original 1901 North Carolina statute and its recodifications

As originally enacted on January 18, 1901, the North Carolina statute contained a preamble and four numbered sections with language similar to that contained in the current statute. *See* Exhibit 6, attached hereto (Chapter 17 of the Public Laws and Resolutions of the General Assembly Session of 1901). In Section 1, the State consents to the federal acquisition of lands for the national forest "by purchase, or by condemnation with adequate compensation, except as hereinafter provided . . . ." Section 1 also contains a sentence reserving concurrent jurisdiction to the State.

Section 2 returns to the subject of authorizing Congress to pass laws necessary for the acquisition of such lands. Significantly, it is only in this section, concerning the acquisition of property, that the 200-acre carve-out appears, providing that as much as 200 acres of land occupied as a home on the date of ratification "shall be exempt from the provisions *of this section*." (Emphasis added.) Thus, as originally enacted, the carve-out exception clearly was in the separate and distinct section dealing with authorization to acquire title to land, and had nothing to do with the state's reservation of concurrent jurisdiction as set out in an earlier section.

13

Section 3 of the 1901 statute confers power on Congress to pass laws and enact rules and regulations "of both civil and criminal nature" as it deems necessary. This section contains no limitations or carve-outs. The State thereby was clearly authorizing the United States to enact and enforce criminal laws on any land it acquired, with no caveats.

In the statutory Revision of 1905, the original statute was recodified as Section 5430. That statute, attached hereto as Exhibit 7, restates the 1901 statute with minor changes in the language, but the chief change is that the previous four sections of the law are now compressed into a single paragraph. In later recodifications of this statute in 1919, attached hereto as Exhibit 8, and in 1924, attached as Exhibit 9, the language remained unchanged. Finally, in 1929, the statute took its present form when the General Assembly expanded the authorization for the United States to purchase land for national forests anywhere in North Carolina, not just in the western part of the state. *See* Exhibit 10 (Chapter 67 of the Public Laws of 1929).

Thus, the language and four-part structure of the original 1901 statute make it clear that North Carolina authorized the United States to acquire land for purposes of a national forest either by voluntary purchase or by condemnation, with the caveat that this consent did not extend to a taking of a homestead of up to 200 acres in size. This limitation was explicitly set out in a separate section, dealing only with the

14

acquisition of land. There were no limitations on the federal exercise of concurrent jurisdiction over whatever property the United States was authorized to acquire. Later recodifications of the statute might have muddied the waters slightly by compressing the four sections of the original statute into a single lengthy paragraph, but did not change the intent.

### 2. Contemporaneously-enacted statutes in other states

North Carolina was one of at least four states to enact a statute in 1901 authorizing the United States to acquire land in the high mountain regions for purposes of establishing a national forest reserve. A reading of North Carolina's 200 acre carve-out language as being concerned with limiting the federal government's condemnation powers, not its exercise of concurrent jurisdiction, is consistent with those other statutes.

One month after North Carolina passed its cession and consent statute, South Carolina enacted an essentially verbatim one, attached hereto as Exhibit 11. South Carolina's statute is so similar to North Carolina's that it includes almost identical language in the title of the act, the two preamble paragraphs, and the four numbered sections. The only substantive difference in the statutes concerns limitations on the federal government's condemnation powers. North Carolina's language in its Section 1 limited condemnation "except as hereinafter provided," whereas South

Case 2:13-cr-00015-MR-DLH   Document 82   Filed 12/18/13   Page 15 of 26

Carolina's Section 1 provides for "condemnation according to law." Each state's Section 2 contains an identical first sentence conferring power on Congress to pass laws necessary to the acquisition of such land. Then each statute contains a sentence, starting with "*Provided*," that limits that acquisition power. North Carolina's has the 200 acre carve-out, while South Carolina prohibits the power of condemnation geographically and also as to "any building, dwelling house or cultivated or pasture lands."

Just two months later, Tennessee also enacted an essentially verbatim version of this statute. *See* Exhibit 12. The Tennessee statute contains the same title, preamble language, and four numbered sections as the North Carolina and South Carolina statutes. Once again, the only substantive difference comes in the limitation on the location where the federal government may acquire the land, and on its condemnation powers. In Tennessee, this limitation is added at the end of Section 1: "that all condemnation proceedings herein provided shall be limited to lands now forest covered, and that in all such condemnation proceedings the right of the Federal Government shall be limited to the specific objects set forth in this Act, and in the laws of the United States in regard to forest reserves."

Georgia, too, enacted a consent statute in 1901 that is virtually identical to the versions enacted in North Carolina, South Carolina, and Tennessee, right down to

16

the title, the preamble paragraphs, and the four sections. *See* Exhibit 13. Once again, the only substantive difference with North Carolina's statute (and therefore with South Carolina's and Tennessee's) concerns condemnation: the Georgia statute authorizes "condemnation according to law" but omits any type of limitation on that authorization. Georgia soon remedied that omission. In 1917, it amended the statute to permit condemnation "of only such lands as may be contracted, proposed, or offered for sale in writing by the ostensible owner to the United States, in which the owner consents to such condemnation of lands in the mountain region of Georgia . . . ." *See* Exhibit 14.

These four states' contemporaneous, almost-verbatim, statutes show that each state provided authorization to the United States to acquire mountain land for purposes of establishing a national forest reserve, each state granted the United States concurrent jurisdiction, without reservation or limitation, and each state authorized Congress to enact such laws as may be necessary to the acquisition of such lands and to make all necessary rules and regulations of both a civil and criminal nature. The only substantive difference, and the only matter as to which each state "customized" its version of this statute, came in the limitation of condemnation powers: in North Carolina, the 200 acre homestead exemption; in South Carolina, as to any building, dwelling house or cultivated or pasture lands; in

17

Tennessee, it was limited to forest-covered lands; and in Georgia, it was initially not limited at all, but was later limited only to land as to which the owner consented in writing.[6]

### 3. This land was lawfully acquired by the United States

The Government has attached in Exhibits 2 and 3 the entire files of this Court with regard to the condemnation actions whereby the United States acquired these two parcels in 1916. Those files contain not just the complaints, but also the answers of the putative owners. There is no assertion, in either case, that the Government is barred from acquiring these parcels due to their having had a homestead on them 15 years earlier. There is simply nothing in the record to indicate that these parcels were therefore immune from eminent domain, and it strains credulity to believe that the putative owners, represented by local counsel, would have failed to assert such a defense if it had been available. The only logical conclusion is that the United States lawfully acquired this land 97 years ago.

### B. *In NCGS § 113-307.1(a), North Carolina Authorized the United States to Enact Laws Regarding Game Animals on Land Acquired by the United States*

---

[6] It is also noteworthy that the various states' interest in limiting the federal government's power to acquire land prompted some states, in enacting their version of this consent statute, to omit such authorization of condemnation altogether, authorizing federal land acquisitions only by "purchase or gift." *See, e.g*., Louisiana Acts of 1922, Act No. 90, Sec. 10 (attached hereto as Exhibit 15); Mississippi Laws of 1926, Chapter 161, Sec. 4 (attached hereto as Exhibit 16). The Government's research, however, has found no state with any type of limitation or carve-out on the granting of concurrent jurisdiction.

18

In addition to North Carolina's authorization in NCGS § 104-5, the State has also enacted a separate grant of authority for the United States to enact and enforce laws relating to wildlife on lands purchased by the United States in Western North Carolina. General Statute § 113-307.1(a) provides:

> The consent of the General Assembly of North Carolina is hereby given to the making by the Congress of the United States, or under its authority, of all such rules and regulations as the federal government shall determine to be needful in respect to game animals, game and nongame birds, and fish on such lands in the western part of North Carolina as shall have been, or may hereafter be, purchased by the United States under the terms of the act of Congress of March 1, 1911 [the Weeks Act], and acts of Congress supplementary thereto and amendatory thereof, and in or on the waters thereon.

In *Chalk v. United States*, 114 F.2d 207 (4th Cir. 1940), the Fourth Circuit applied the predecessor of this section in holding that the United States had been granted the authority by the State to enforce federal game laws in the Pisgah National Forest, even when those laws conflicted with State laws. "Having purchased the lands in question, with the consent of the State of North Carolina, . . . the right of the [United States] to protect its lands and property from severe damage cannot be doubted. . . . In addition to the inherent power of the Government to protect its property we have the power expressly ceded to the [United States] by the State of North Carolina in the [predecessor of NCGS § 113-307]." *Id.* at 210-11.

19

This section is directly applicable here: the offenses on Forest Service property occurred on land in the western part of North Carolina that had been acquired by the United States under the terms of the Weeks Act, and were violations of rules and regulations in respect to game animals. This section therefore provides a separate and equally efficacious basis for finding that the State of North Carolina has consented to the federal government's enactment and enforcement of the type of regulation forming the basis for this prosecution.

### III. The United States Has Also Obtained Jurisdiction Pursuant to the Property Clause

The Government submits that this Court has ample basis to find that the United States has concurrent jurisdiction under the Enclave Clause over offenses committed on national forest lands, based on North Carolina's consent and cession and the federal government's acceptance. The Property Clause, however, provides a separate basis for the exercise of jurisdiction. The Supreme Court has given this clause an "expansive" reading. *Kleppe*, 426 U.S. at 539. In *Kleppe*, the Court rejected a challenge to the federal government's authority to enact and enforce certain wildlife protection laws on federal land, even when the State opposed such laws. The Court also rejected a claim that the Property Clause only gave the United States power to enact laws protecting property but not wildlife that might be found on such property: "We hold today that the Property Clause also gives Congress the

power to protect wildlife on the public lands, state law notwithstanding." *See also Nevada v. Watkins,* 914 F.2d 1545, 1554 (9th Cir.1990) (state's consent is not a prerequisite to federal regulation of federal lands when Congress acts pursuant to its plenary authority under the Property Clause).

## IV. The Defendants' Remaining Arguments Are Also Without Merit

In Count 1, the defendants are charged with conspiring to knowingly sell, acquire, receive, and transport wildlife by providing guiding services for money and other consideration, knowing that the wildlife had been taken, possessed, transported, and sold in violation of and in a manner unlawful under federal law (in the incident involving the undersized bear whose killing in the Nantahala National Forest is also the subject of Count2), and knowingly selling, acquiring, receiving and transporting in interstate commerce a bear, knowing that the bear had been taken, possessed, sold and transported in violation of Georgia state law. That second object of the conspiracy relates to the overt acts set forth in paragraphs numbered 6 and 7 of Count 1.

With regard to the first object of the conspiracy, the defendants make much of the fact that the undersized bear was never transported in interstate commerce, as though that were necessary to make its killing a federal offense. Defendants ignore the fact that, as the indictment clearly alleges, this object of the conspiracy was a

21

violation of 16 U.S.C. § 3372(a)(1), which has no requirement of interstate transportation of the wildlife.

With regard to the second object of the conspiracy, the killing of a bear in Georgia in violation of state law as part of the defendant's guide services, the federal basis for jurisdiction is that the illegally-taken wildlife was transported in interstate commerce, in violation of 16 U.S.C. § 3372(a)(2)(A). The evidence at trial will show that the conspirators knew that the customer (the undercover agent) was from North Carolina, only had a North Carolina hunting license, and that he would be returning to North Carolina with his kill. Defendant Jerry Parker in particular helped him prepare the carcass and load it into the UC's vehicle, with North Carolina tags, to take it back home with him.

The Lacey Act was amended in 1988 to add language relevant here:

Sale and Purchase of guiding and outfitting services and invalid licenses and permits

(1) Sale
It is deemed to be a sale of fish or wildlife in violation of this chapter for a person for money or other consideration to offer or provide –

(A) guiding, outfitting or other services; or
(B) a hunting or fishing license or permit

for the illegal taking, acquiring, receiving, transporting or possessing of fish or wildlife.

22

16 U.S.C. § 3372(c). Here, the defendants conspired to "sell" illegally-taken wildlife, as defined by the statute, by providing guide services for money ($1500.

In *United States v. Atkinson*, 966 F.2d 1270 (9th Cir. 1992), the Ninth Circuit upheld the Lacey Act conviction of a defendant who provided hunting guide services in Montana, knowing that the client hunters were hunting without Montana licenses, and aiding them in violating other Montana hunting laws. At the end of each hunt, the defendant either arranged to ship the wildlife carcasses to the hunters' homes outside Montana, or assisted them in such shipments. *Id*. at 1275. The court held that the defendant was lawfully convicted of conspiring to "sell" illegally taken wildlife by providing these guiding services involving the illegal killing of wildlife, and that the interstate commerce element was satisfied because the defendant knew that the wildlife would be transported in interstate commerce and he took steps to begin the wildlife's interstate travel. *Id*. *See also United States v. Fejes*, 232 F.3d 696 (9th Cir. 2000) (holding that the term "sale" includes both the agreement to receive consideration for guiding services as well as the actual provision of such services, where the defendant provided guide services to out-of-state hunters who killed caribou in violation of Alaska law and assisted them in transporting the wildlife from the field so the hunters could take it to their home states); *United States v. Dupont*, 2012WL 122352 (M.D. La. 2012) (where the

23

defendant was charged with providing guide services to take alligators in violation of the Endangered Species Act, the court held that "sale" for purposes of the Lacey Act includes both the agreement to receive consideration for guide services and the actual provision of such services).

The discovery provided to the defense, and the evidence at trial, will show that the there was a conspiracy to "sell" wildlife by providing hunting guide services, that those services led to the killing of bears in violation of federal law as well as state law, and that in the latter incident the a conspirator acted in furtherance of the scheme by assisting in the preparation and transport across state lines of the illegally taken wildlife.

## CONCLUSION

The United States has jurisdiction to prosecute the Lacey Act offenses charged in the indictment. The United States respectfully submits that the defendants' motions to dismiss the indictment should be denied in their entireties.

RESPECTFULLY SUBMITTED, this the 18th day of December, 2013.

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

/s Richard Lee Edwards
_____

RICHARD LEE EDWARDS
ASSISTANT UNITED STATES ATTORNEY

N.C. Bar Number: 30205
100 Otis Street, Suite 233
Asheville, NC 28801
Telephone: (828) 271-4661
Facsimile: (828) 271-4670
Richard.Edwards2@usdoj.gov

# CERTIFICATE OF SERVICE

The foregoing document was filed electronically via ECF and was served on counsel for the Defendants, Eric W. Stiles and Russell L. McLean, III, via ECF.


This the 18th day of December, 2013.



ANNE M. TOMPKINS
UNITED STATES ATTORNEY

/s Richard Lee Edwards

RICHARD LEE EDWARDS
ASSISTANT UNITED STATES ATTORNEY
N.C. Bar Number: 30205
100 Otis Street, Suite 233
Asheville, NC 28801
Telephone: (828) 271-4661
Facsimile: (828) 271-4670
Richard.Edwards2@usdoj.gov